**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GABRIEL MICHAEL BAUMER,** | : | **Civil No. 1:24-CV-1510** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **FRANK BISIGNANO,** [1] | : | **(Magistrate Judge Carlson)** |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

## I. Introduction

Social Security disability decisions are guided by a familiar five-step paradigm. For claimants, the most demanding of these steps is Step 3. In order to prevail at Step 3, a claimant must show that he or she meets all of the criteria of a regulatory listing which would define the claimant as *per se* disabled. However, to qualify for benefits at Step 3 by showing that an impairment, or combination of

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The instant case illustrates how demanding this burden of proof can be. The plaintiff in this case, Gabriel Baumer, was born in January of 2001 and had not attained the age of 22 by the time of the alleged onset of what he described as disabling emotional impairments. Moreover, while youthful, Baumer had not engaged in any form of substantial gainful activity by the time of this disability application. After imposing a highly restrictive and carefully detailed mental residual functional capacity for Baumer which addressed his mental limitations, the ALJ relied upon the testimony of medical and vocational experts to conclude that there was work in the national economy which the plaintiff could perform.

Baumer now challenges this decision, arguing that the ALJ erred at Step 3 in evaluating the medical opinion evidence and in failing to recognize that the plaintiff was *per se* disabled. With Baumer's argument couched in terms of a Step 3 error, the plaintiff faces a doubly demanding burden in this case. First, in order to succeed at Step 3, he must show that he met all of the pertinent listing criteria. Further,

Baumer must carry this burden of proof and persuasion in the face of a highly deferential "substantial evidence" standard of review, which is limited by the Supreme Court's mandate that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 587 U.S. 97, 102–03, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019). Under this standard of review, we are obliged to affirm the decision of the administrative law judge (ALJ) once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)).

Here, the ALJ's decision, read as a whole, adequately assessed the plaintiff's emotional impairments, and provided a substantial basis grounded in the evidence for the conclusion that Baumer was not *per se* disabled. Therefore, mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's Step 3 findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II. Statement of Facts and of the Case

### A. Introduction

The plaintiff, Gabriel Baumer, filed an application for supplemental security income benefits pursuant to Title XVI of the Social Security Act on April 8, 2021. One month later, on May 3, 2021, Baumer also filed an application for child's insurance benefits based on disability. In both applications, the claimant alleged an onset of disability beginning August 20, 2020.(Tr. 17).

According to Baumer he was completely disabled due to an array of emotional impairments including attention deficit hyperactivity disorder (ADHD); a specific learning disability; anxiety; bipolar disorder; asthma; and migraines headaches. (Tr. 20). Baumer was born on January 4, 2001, and thus had not attained age 22 as of August 20, 2020, the alleged onset date. (Id.) At the time of his disability application

Baumer had no prior relevant work history and possessed a limited education. (Tr. 35).

**B. Clinical History**

With respect to Baumer's migraines and related emotional and intellectual impairments, the medical record is equivocal. That record undoubtedly documented that these impairments were significant, an imposed severe limitations on Baumer. However, substantial evidence also suggested that these conditions were not totally disabling and Baumer retained the ability to perform some work.

For example, as the ALJ aptly noted:

> In regards to his migraine headaches, while he reported to the consultative examiner in April 2022 that he has migraines several times a week lasting 1-24 hours, and that they are triggered by bright light, and cause irritability, the records throughout the relevant time note no reports to any of his providers detailing the frequency of his migraines. Specifically the records reflect in July 2020 his migraines were controlled, and in April 2021 he stated he had not had any migraines in the last few months (Exhibits 5F/13, 21, 8F/1). Again in October 2021 the record notes his migraines were controlled, and in April 2022 his primary care physician notes he has not had a breakthrough headache in several months. Lastly in October 2022 the record reflects his migraines are controlled (Exhibits 5F/27, 12F/1, 28F/48).

(Tr. 29).

The clinical record regarding Baumer's intellectual and emotional impairments likewise contained evidence of significant medical conditions but also

had elements which supported a finding that the impairments were not wholly disabling. As the ALJ explained:

> Here, the record reflects that the claimant treats for his mental impairments; however, clinical findings on mental status examinations are within the mild to moderate range, with many findings noted consistently as unremarkable. To illustrate, the records reflect the claimant as consistently oriented to person, place, and time, as well as cooperative, with normal speech, and logical and goal directed thought processes. Also, while there were a few instances where he was noted to be disheveled, generally the record reflects the claimant a being well groomed with good hygiene. Further, he reported memory problems, the record reflects his concentration as distractable/inattentive, and his insight and judgment were noted to be fair. Additionally the record reflects the claimants affect as alternating between blunted and normal, and his mood as shifting between anxious, okay, low, and irritable (Exhibits 4F/29, 35-36, 38, 12F/5, 31f/8). Relative to his thought content, while there are reports of alter egos, and audio and visual hallucinations, his mental status examinations note no hallucinations or delusions during examination. Also specific mention of the same by the claimant to his providers are sporadic throughout the longitudinal record. For instance in April 2021 he mentioned hearing voices, and having avatars for his feelings, the in September 2021 he denied any visual hallucinations, but stated he will sometimes hear a noise in the background like a television but is unable to find it. Thereafter it was not until July 2022 that he reported waking up hearing someone call his name. Subsequently in April 2023, he reported having more issues with visual and auditory hallucinations, and in July 2023 he reported hearing a radio in the kitchen but there being none there. Lastly, in August 2023 he reported having continued hallucinations (Exhibits 4F/30, 37-38, 30F/2, 18, 31F/30, 50, 75, 84).
>
> As it pertains to his suicidal and homicidal ideations, where noted, the record reflects them being generally passive with no intent or plan. Specifically in February and March 2021 the record notes passive suicidal ideations. Thereafter in September 2021 one record notes that

while he had some suicidal ideations when 17, he never acted on them, and since then he has not had any significant suicidal issues and another notes that he reports having suicidal ideations when thinking of working full time. In November 2021 he reported when he stopped working he had several suicidal ideations but there was no real intent. However he did report he got a gun out. Subsequently in December 2021 he reported persistent suicidal ideations with no real plan or intent. Thereafter in May 2022 the claimants reports note benign suicidal ideations, and in December 2022 it notes no suicidal ideations. Lastly in April 2023 the record notes suicidal ideations without intent (Exhibits 4F/29, 37, 12F/4-5, 28F/46, 30F/2, 4, 28, 51, 57, 60, 65, 31F/2, 5, 24, 50, 65, 84).

In addition to the above, the claimant's history notes that when he was in school he had an independent education plan (IEP) for a specifical learning disability in reading fluency and math calculation. Further, a full-scale IQ test performed in 2018 was 87 with a verbal comprehension score of 102 (Exhibits 3E/1-2).

On April 25, 2022, Adrienne Gallo, Psy.D., saw the claimant for a consultative psychological examination. On mental status examination he was cooperative and well groomed, with slouched posture, restlessness motor behavior, and appropriate eye contact. His speech was fluent and clear, and his expressive and receptive languages were adequate. Further his thought processes were coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia in the evaluation setting; his affect anxious; his mood was anxious but then improved; his sensorium was clear; and he was oriented to person, place, and time. It was also noted that his attention, concentration, recent, and remote memory appeared impaired due to anxiety, his insight and judgment were fair, and his intellectual functioning was below average (Exhibit 7F).

On November 10, 2022, Andrew Cole, Psy.D. saw the claimant for a consultative psychological examination. On mental status examination the claimant was cooperative, his manner of relating was adequate, he was well groomed with normal postural, motor behavior, and eye

> contact. Further his speech was fluent and clear, and his expressive and receptive language skills were adequate. Also his thought processes were goal directed and coherent with no evidence of hallucinations, delusions, or paranoia. Additionally his affect was of full range, his mood tired, his sensorium clear, and he was oriented to person, place, and time. Moreover his attention and concentration were slightly impaired and his recent and remote memory impaired, with his overall intellectual functioning noted to be in the borderline to impaired range. Lastly, his insight and judgment were fair (Exhibit 14F).

(Tr. 30-31).

**C. Activities of Daily Living**

Baumer's activities of daily living also suggested that he retained the ability to perform some simple tasks despite his emotional and intellectual limitations. As Dr. Adrienne Gallo, an independent expert, observed during her April 25, 2022, consultative examination of the plaintiff, Baumer reported that he: "[C]an dress, bathe, and groom himself. He can cook and prepare food, clean, do laundry, and shop. His mother manages the money. . . . He enjoys writing, woodwork, gaming, model building, and collecting books, and spends his day reading, gaming, relaxing, or cleaning." (Tr. 504).

**D. The Medical Opinion Evidence**

With respect to the central issue in this appeal, the question of whether Baumer's impairments satisfied any listing requirements at Step 3, the medical opinion evidence is notable in at least one respect. While some opining experts

identified specific areas where Baumer faced marked impairment, no expert stated that he met the listing requirement of marked impairment in two broad spheres of workplace functioning or extreme impairment in at least one area of functioning. Thus, none of the expert opinions clearly supported a Step 3 finding of disability.

Two of these opinions were provided by state agency experts. At the outset, on May 2, 2022, Dr. Shelley Harriet Ross found based upon an examination of Baumer's medical records that he experienced mild impairment understanding, remembering, or applying information and was moderately impaired in terms of interacting with others, concentration, persistence, or pace, and adapting or managing himself. (Tr. 84). Dr. Ross therefore concluded that Baumer did not meet listing requirements but rather could perform simple tasks. (Tr. 87-88).

On November 23, 2022, Dr. Dawn Long reached similar conclusions concerning Baumer's mental functioning and also concluded that he was not totally disabled. Like Dr. Ross, Dr. Long found that Baumer was mildly impaired understanding, remembering, or applying information and was moderately impaired in terms of interacting with others, concentration, persistence, or pace, and adapting or managing himself. (Tr. 104). According to Dr. Long:

> The claimant's basic memory processes are intact. The claimant can understand, retain, and follow simple instructions (i.e., perform one-

> and two-step tasks).[2] The claimant can make simple decisions and would not require special supervision in order to sustain a routine. The claimant can perform simple, routine, repetitive tasks in a stable environment. The claimant is capable of performing within a schedule and at a consistent pace.
>
> The claimant is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene. The claimant is capable of asking simple questions and accepting instruction. The claimant is able to interact appropriately with the general public. The claimant is able to get along with others without distracting them. The claimant can exercise appropriate judgment.

(Tr. 110).

These state agencies experts had the benefit of a consultative examination of Baumer conducted by Dr. Adrienne Gallo on April 25, 2022. (Tr. 502-505). As a result of her examination, Dr. Gallo found that Baumer's demeanor and appearance were normal; his speech was fluent; his thought processes were coherent; his sensorium was clear; and he was fully oriented. (Tr. 503-504). While Baumer presented as anxious, which impaired his memory and attention somewhat, and his intellectual functioning below average, he showed fair judgment and insight. (Tr. 504). Moreover, Dr. Gallo found that Baumer: "[C]an dress, bathe, and groom

[2] In some instances, state agency experts' casual references to one-to-two step tasks have been found to be legally problematic if rejected without analysis by an ALJ, however, no such error occurred here since the ALJ addressed, and discounted, this specific limitation.

himself. He can cook and prepare food, clean, do laundry, and shop. His mother manages the money. . . . He enjoys writing, woodwork, gaming, model building, and collecting books, and spends his day reading, gaming, relaxing, or cleaning." (Tr. 504).

Dr. Gallo's function-by-function assessment of Baumer found that he had no limitations understanding and carrying out simple instructions; mild limitations carrying out simple work-related decisions and understanding complex instructions; and moderate impairments carrying out complex instructions. (Tr. 515). While Dr. Gallo felt that Baumer displayed marked impairment in aspects of one sphere of functioning, interacting with the public and supervisors, she concluded that Baumer was only moderately impaired when it came to interacting with co-workers. Dr. Gallo also found that Baumer had no limitations responding to changes in workplace routine. (Tr. 516). These findings fell well short of the listing criteria for disability, which required marked impairment in two distinct spheres of workplace conduct.

Finally, on November 10, 2022, a second consulting examining source, Dr. Andrew Cole, evaluated Baumer's mental state. (Tr. 578-585). Like Dr. Gallo, Dr. Cole found that Baumer's demeanor and appearance were normal and his speech was fluent. (Tr. 580). Baumer's thought processes were coherent; his sensorium was clear; and he was fully oriented. (Id.) While Baumer's memory, cognitive

functioning, and concentration were somewhat impaired, his insight and judgment were fair and Baumer reported to Dr. Cole that he "dresses, bathes, and grooms himself, cleans, and does laundry." (Id.)

Dr. Cole's function-by-function evaluation of Baumer also fell short of the dictates of any mental health listing requirement, which required, at a minimum, marked impairment in two separate spheres of functioning. Dr. Cole found that Baumer was only mildly impaired with respect to understanding, following and executing simple instructions. (Tr. 584). According to the doctor, Baumer was moderately limited when it came to following understanding complex instructions and experienced marked limitations following and carrying out complex guidance. (Id.) However, Dr. Cole also found that Baumer was only moderately impaired in terms of interacting with others and adapting to workplace changes. (Tr. 585).

It was against this medical backdrop that Baumer's case came to be heard by an ALJ.

**E. The ALJ Decision**

A hearing was conducted in Baumer's case on October 5, 2023, at which Baumer, his mother and a vocational expert testified. (Tr. 44-80). Following this hearing, on December 26, 2023, the ALJ issued a decision in Baumer's case denying this application for benefits. (Tr. 14-40). In that decision, the ALJ first concluded

that Baumer had not attained age 22 as of August 20, 2020, the alleged onset date and had not engaged in substantial gainful activity since the alleged onset date. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Baumer had the following severe impairments: attention deficit hyperactivity disorder (ADHD); specific learning disability; anxiety; bipolar disorder; asthma; and migraines headaches. (Tr. 20).

At Step 3, the ALJ determined that Baumer did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. On this score, the ALJ's Step 3 analysis was thorough, detailed and dispassionate. As the ALJ explained:

> The claimant's migraines cannot meet a listing in Appendix 1 because migraines are not a listed impairment. However, in accordance with SSR 19-4p, the undersigned considered whether the claimant's migraines alone, or in combination with another impairment, medically equals a listing. Accordingly, the undersigned evaluated the claimant's migraines under section 11.00, which covers impairments of the neurological system, and in particular listing 11.02(B) and (D) for epilepsy. The undersigned determined that the findings related to his migraines were not of equal medical significance to any listed impairment, and no medical source stated that either the claimant's migraines or the claimant's combination of impairments was of equal medical significance to that of a listed impairment (Exhibits 3F, 5F, 6F, 8F, 11F, 12F, 16F, 20F, 21F, 26F, 27F, 28F) (see 20 CFR 404.1526, 416.926). Therefore, the claimant's migraines do not meet or medically equal any listed impairment.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.05, and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria ("paragraph A or B" criteria of listing 12.05) are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a mild limitation. Under the law and regulations, this area refers to an individual's ability to learn, recall, and use information to perform work activities. The undersigned will consider the claimant's ability to understand and learn terms, instructions, and procedures, and to follow one to two step oral instructions. Other areas considered are the claimant's ability to recognize a mistake and correct it, identify, and solve problems, sequence multi step activities, and use reason and judgment to make work-related decision[s].

When the claimant was in school, he had an independent education plan (IEP) for a specific learning disability in reading fluency and math calculation (Exhibit 3E/1). Further the claimant alleges difficulty with understanding and his memory. Specifically he indicates he needs reminders to take his medication and to go places (Exhibit 12E). Additionally during the first consultative psychological examination his recent and remote memory appeared to be impaired due to anxiety and during the second it was noted to be impaired (Exhibits 7F, 14F). Moreover Adrienne Gallo, Psy.D., noted a moderate limitation in carrying out complex instructions and making judgments on complex work-related decisions and Andrew Cole, Psy.D., noted marked limitations in carrying out complex instructions and making judgments on complex work-related decisions (Exhibits 9F, 15F). Despite the forgoing, the claimant is able to care for his personal needs independently, but with some reported pain in performing the activities.

He also is able to prepare simple meals; vacuum; do laundry; shop by computer; read; play video games; video chat; do woodwork/woodcarving; build models; play Dungeons and Dragons; watch television; and make things on a 3D printer (Hearing Record, Exhibits 8E, 12E, 7F, 8F/2, 14F/4, 21F/2, 30F/45, 73, 31F/13, 10, 21, 36, 44, 75). Also, from June of 2021 to September 2022 there is reference to the claimant writing a book (Exhibits 4F/37-38, 13F/10, 23, 30F/26, 31F/36).

Moreover, the claimant's full-scale IQ (FSIQ) from 2018 was 87 (Exhibit 3E/2). In addition, Shelley Harriet Ross, Ph.D., and Dawn Marie Long, Psy.D., reviewed the file with Dr. Ross noting a mild limitation and Dr. Long a moderate limitation in this area (Exhibits 1A, 3A, 5A, 8A). Therefore, considering the claimant's testimony, actual level of activity, and giving the claimant every benefit of the doubt as supported by the record, the undersigned finds no more than a mild limitation in understanding, remembering, or applying information.

In interacting with others, the claimant has a moderate limitation. Evidence of limitation in this area refers to the claimant's capacity to relate to and work with supervisors, coworkers, and the public. Examples of interacting with others includes cooperating with others, asking for help when needed, handling conflicts, initiating, or sustaining conversations, understanding, and responding to social cues, responding to requests, criticism, or challenges, and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

The claimant reports anger, rage, and irritability; as well as avoidance of social situations/social withdrawal and panic and anxiety attacks; (Exhibits 4F/30, 37, 7F/2, 12F/5, 14F/2). He also reports hearing voices and seeing people that are not there (Hearing Record, Exhibits 31F/30, 50, 84). Moreover Adrienne Gallo, Psy.D., noted a marked limitation interacting appropriately with the public and supervisors (Exhibit 9F). Despite the forgoing, the claimant's mental status examinations consistently note he is oriented to person, place, and time, as well as cooperative with normal speech and logical and goal directed thought

processes (Exhibits 4F/29, 35-36, 38, 30F). Further, the claimant's medical records do not reflect him having any problems interacting with any of his providers or their staff. In addition, Shelley Harriet Ross, Ph.D., and Dawn Marie Long, Psy.D., reviewed the file and found a moderate limitation in this area (Exhibits 1A, 3A, 5A, 8A). Also, Andrew Cole, Psy.D. notes moderate limitations in interacting with the public, supervisors, and co-workers, and responding appropriately to usual work situations and changes in a routine work setting (Exhibit 15F). Furthermore Adrienne Gallo, Psy.D. noted a moderate limitation interacting with coworkers (Exhibit 9F). Therefore, considering the claimant's testimony, actual level of activity, and giving the claimant every benefit of the doubt as supported by the record, the undersigned finds no more than a moderate limitation in interacting with others.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. Evidence in this area of functioning concerns actions that demonstrate the ability to focus attention on work activities and stay on task at a sustained rate. Examples include initiating and performing a work task, working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring distractions, changing activities without being disruptive, and working close to or with others without interrupting or distracting them. This area also considers an individual's ability to sustain an ordinary routine and regular attendance at work, as well as the ability to work a full day without needing more than the allotted number or length of rest periods customarily provided.

The claimant reports having difficulty concentrating, and states when he hears the voices (audible hallucinations), they distract him. Additionally he reports racing thoughts (Hearing Record, Exhibits 7F/2, 12F/4, 14F/2, 31F/57). Moreover, during the first consultative psychological examination his attention and concentration appeared to be impaired due to anxiety and during the second it was noted to be slightly impaired (Exhibits 7F, 14F). Despite the forgoing, the claimant is able to care for his personal needs independently, but with some reported pain in performing the activities. He also is able to prepare simple meals; vacuum; do laundry; shop by computer; read; play video

games; video chat; do woodwork/woodcarving; build models; play Dungeons and Dragons; watch television; and make things on a 3D printer (Hearing Record, Exhibits 8E, 12E, 7F, 8F/2, 14F/4, 21F/2, 30F/45, 73, 31F/13, 10, 21, 36, 44, 75). Also, from June of 2021 to September 2022 there is reference to the claimant writing a book (Exhibits 4F/37-38, 13F/10, 23, 30F/26, 31F/36). Furthermore, in April 2021 the claimant reported being able to focus on tasks; in October 2021 he reported having no trouble concentrating; in April 2022 he reported being able to focus on daily tasks; in December 2022 he reported having no trouble concentrating; and in June 2023 he reported he could focus on tasks (Exhibits 5F/21, 26, 12F/1, 28F/46, 51). In addition, Shelley Harriet Ross, Ph.D., and Dawn Marie Long, Psy.D., reviewed the file and found a moderate limitation in this area (Exhibits 1A, 3A, 5A, 8A). Also, Adrienne Gallo, Psy.D., noted the claimant has difficulty focusing and maintaining but does not state to what extent, i.e., mild, moderate, marked, or severe, and Andrew Cole, Psy.D., notes no limitations in this area (Exhibits 9F, 15F). Therefore, considering the claimant's testimony, actual level of activity, and giving the claimant every benefit of the doubt as supported by the record, the undersigned finds no more than a moderate limitation in concentrating, persisting, or maintaining pace.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. This area refers to the claimant's ability to regulate emotions, controls behaviors, and maintain well-being in a work setting. This includes the ability to respond to demands, adapt to changes, manage psychologically based symptoms, distinguish between acceptable and non-acceptable work performance, and setting realistic goals. This area also considers the claimant's ability to maintain personal appearance and attire, and to be aware of normal hazards and to take precautions.

The claimant reports having alter egos which he also refers to as avatars that he states represent different parts of his personality/emotions and that he hears them talking in his mind (Hearing Record, Exhibits 4F/30, 37-38, 30F/2, 18). Further he reports variable sleep, either sleeping too much or not enough; nightmares; flashbacks; and intrusive thoughts

with occasional passive suicidal ideations (Exhibits 4F/29, 37, 7F/2, 12F/4-5, 14F/2, 30F/2, 4, 51, 57, 60, 65, 31F/24, 50). Despite the forgoing, the claimant is able to care for his personal needs independently, but with some reported pain in performing the activities. He also is able to prepare simple meals; vacuum; do laundry; shop by computer; read; play video games; video chat; do woodwork/woodcarving; build models; play Dungeons and Dragons; watch television; and make things on a 3D printer (Hearing Record, Exhibits 8E, 12E, 7F, 8F/2, 14F/4, 21F/2, 30F/45, 73, 31F/13, 10, 21, 36, 44, 75). Also, from June of 2021 to September 2022 there is reference to the claimant writing a book (Exhibits 4F/37-38, 13F/10, 23, 30F/26, 31F/36). Further, mental status examinations note that the claimant is consistently oriented to person, place and time, and cooperative with normal speech, and logical and goal directed thought processes (Exhibits 4F/29, 35-36, 38, 12F/5). In addition, Shelley Harriet Ross, Ph.D., and Dawn Marie Long, Psy.D., reviewed the file and found a moderate limitation in this area (Exhibits 1A, 3A, 5A, 8A). Also, Adrienne Gallo, Psy.D., and Andrew Cole, Psy.D., note no limitations in this area (Exhibits 9F, 15F). Therefore, considering the claimant's testimony, actual level of activity, and giving the claimant every benefit of the doubt as supported by the record, the undersigned finds no more than a moderate limitation in adapting or managing oneself.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria (criteria of listing 12.05) are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria of 12.04, and 12.06 are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. To meet the "C criteria," a claimant must meet section 1 and 2. The evidence does not show that the claimant's mental impairments meet section 2. Here the medical evidence of record does not show such marginal adjustment that the claimant has minimal capacity to adapt to changes in the environment or to demands that are not already part of his daily life when mental status findings are no more than mild to moderate, with

some consistently noted as unremarkable. Further, the evidence does not show that simple changes or increased demands have led to a deterioration of the claimant's functioning or inability to function outside the home especially when his treatment is conservative, with no indication of any reference for any group therapy, partial hospitalization program, inpatient hospitalization, or other form of intensive mental health intervention during the relevant time. As such, the "paragraph C" criteria are not met.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

Turning back to listing 12.05, this listing is based on the three elements that characterize intellectual disorder: significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and the disorder manifested before age 22. The required level of severity for this disorder is met when the requirements in paragraphs A or B are satisfied.

Paragraph A requires the following:

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and
2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and
3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or

> supports the conclusion that the disorder began prior to your attainment of age 22.
>
> In this case, these requirements are not met because the claimant testified, notes in the function reports he filled out, and reports to the consultative examiners, that he is independent in his personal care needs, such as toileting, eating, dressing, and bathing (Hearing Record, Exhibits 8E, 12E, 7F, 8F, 14F).
>
> Paragraph B requires the following:
> 1. Significantly subaverage general intellectual functioning evidenced by a or b:
>
> a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>
> b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
>
> 2. Significant deficits in adaptive functioning currently manifested by an extreme limitation of one, or marked limitation of two, in the following areas of mental functioning:
>
> a. Understand, remember, or apply information (see 12.00E1); or
> b. Interact with others (see 12.00E2); or
> c. Concentrate, persist, or maintain pace (see 12.00E3); or
> d. Adapt or manage oneself (see 12.00E4); and
>
> 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.
>
> In this case, these requirements are not met because the full-scale IQ score of record is 87, with a verbal compression score of 102 (Exhibit 3E/2). Moreover, as noted above, in the paragraph B discussion, the claimant does not have an extreme, or two marked limitations in the paragraph B criteria.

(Tr. 21-26) (footnotes omitted).

Having conducted this comprehensive Step 3 assessment, between Steps 3 and 4, the ALJ then fashioned the following carefully detailed residual functional capacity ("RFC") for the plaintiff which considered all of Baumer's emotional impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with the following limitations: The claimant can tolerate occasional exposure to extreme cold, extreme heat, high humidity, and atmospheric conditions that can potentially cause respiratory irritation, such as strong fumes, noxious odors, concentrated dust or gases, and work environments with poor ventilation. Further he can tolerate a moderate level of noise, such as the noise level of most department stores and grocery stores. Also he can perform jobs that do not involve exposure to workplace hazards, such as unprotected heights, and dangerous moving machinery. Additionally he can perform jobs, that would take no more than 30 days of training to learn with a specific vocational preparation level of two (SVP 2), which are generally classified as unskilled. Also he can understand, remember, and carry out simple instructions, and he can perform simple, routine, and repetitive tasks. Moreover he can perform jobs that would be considered "low stress" in that they would involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting. Lastly, he can have occasional interaction with coworkers and supervisors; and can perform jobs which would not involve interaction with customers or members of the general public.

(Tr. 26).

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Baumer's self-described limitations. With respect to Baumer's self-reported activities of daily living, the ALJ found that:

> In terms of claimant's daily activities, the claimant is able to perform a wide array of activities despite his impairments. Specifically the claimant is able to care for his personal needs independently, but with some reported pain in performing the activities. He also is able to prepare simple meals; vacuum; do laundry; shop by computer; read; play video games; video chat; do woodwork/woodcarving; build models; play Dungeons and Dragons; watch television; and make things on a 3D printer.

(Tr. 31).

The ALJ also carefully canvassed the medical opinions, none of which found that Baumer's impairments met any listing criteria. (Tr. 33-34). Assessing these opinions in light of the clinical evidence and Baumer's own activities the ALJ found the four opinions partially persuasive in terms of fashioning the plaintiff's highly restrictive RFC.

Having made these findings, the ALJ concluded that Baumer had no past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 35-37). Accordingly, the ALJ concluded Baumer had not met

the exacting standard of disability set by law from the alleged onset date through the date of his decision. (Id.)

This appeal followed. (Doc. 1). On appeal, Baumer chooses a daunting path, arguing that the ALJ erred in assessing the medical opinion evidence and should have found the plaintiff *per se* disabled at Step 3. However, finding that substantial evidence supported the ALJ's Step 3 analysis and decision in this case, for the reasons set forth below, we recommend the Court affirm the decision of the Commissioner.

## III. Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a

> reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 587 U.S. 97, 102–03, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d

607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based in part upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple

work; and [the claimant]'s activities of daily living, . . . ." Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

**B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the

insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at

*5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### C. Legal Benchmarks Governing Step 3 of This Sequential Analysis

This dichotomy between the Act's deferential standard of review and caselaw's requirement that ALJs sufficiently articulate their findings to permit meaningful judicial review is particularly acute at Step 3 of this disability evaluation process. At Step 3 of this sequential analysis, the ALJ is required to determine whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered

disabled *per se* and is awarded benefits. 20 C.F.R. § 416.920(d); Burnett, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one. To be found disabled under step three, a claimant must present medical evidence or a medical opinion that his or her impairment meets or equals a listing. An administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence in the record. Maddox v. Heckler, 619 F. Supp. 930, 935-936 (D.C. Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, § 3:22 (2014), *available at* Westlaw SSFEDCT. However, it is the responsibility of the ALJ to identify the relevant listed impairments, because it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Burnett, 220 F.3d at 120 n.2.

On this score, however, it is also clearly established that the ALJ's treatment of this issue must go beyond a summary conclusion, since a bare conclusion "is beyond meaningful judicial review." Burnett, 220 F.3d at 119. Thus, case law "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function . . . is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as a whole," id., permits a meaningful review of the SLJ's Step 3 analysis. However, when "the ALJ's conclusory statement [at Step 3] is ... beyond meaningful judicial review," a remand is required to adequately articulate the reasons for rejecting the claim at this potentially outcome-determinative stage. Burnett, 220 F.3d at 119.

**D. Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were

broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new

regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other:

> medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).
>
> Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

**F. The ALJ's Decision is Supported by Substantial Evidence.**

In this case, Baumer has chosen a particularly challenging path on appeal. By attacking the ALJ's Step 3 determination based upon challenges to the ALJ's

evaluation of the medical opinion evidence, Baumer faces a doubly daunting standard of review. First, it is well-settled that in order to succeed at Step 3 a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id. Therefore, on appeal Baumer would have to show that the ALJ erred in every aspect of this Step 3 assessment in order to set aside this decision.

Moreover, Baumer's challenge to the factual underpinning of this Step 3 analysis encounters a second legal hurdle—the deferential standard of review that applies generally to Social Security appeals. In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.

Guided by these legal precepts, we conclude that Baumer's attack on this Step 3 determination fails. On this score, the Commissioner's Listing which guides our consideration, Listing 12.05, provides, in part, that in order to meet these criteria for *per se* disability, a claimant must demonstrate extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understanding, remembering, or applying information; (2) Interacting with others; (3) Concentration, persistence, or maintaining pace; and (4) Adapting or managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Likewise, if a listing argument rests upon intellectual limitations, the claimant must show, in part, significantly subaverage general intellectual functioning evidenced by either a full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or a full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence. Id.

Given these listing criteria, Baumer's listing arguments fail. Two examples suffice to demonstrate why this argument is unavailing. First, to the extent that Baumer insists that the evidence establishes that he suffered from marked impairments in two mental spheres of workplace functioning, the simple answer is

that no expert who examined this case agreed that the plaintiff satisfied this listing element. Quite the contrary, the two state agency exerts who assessed Baumer's case agreed that he experienced no marked impairments. Further, the two consulting examining sources each found marked impairment in only one sphere of intellectual functioning, a degree of impairment which also fell below listing requirements.

Indeed, the only way in which Baumer could have met this listing element would have been if the ALJ fashioned a Step 3 evaluation which parsed together only the darkest and most negative aspects of these four medical opinions. The ALJ chose not to follow this course, and nothing in the law or facts required him to embrace the most negative view of Baumer's ability to meet these listing factors. Therefore, this claim fails.

Likewise, substantial evidence supported the ALJ's conclusion that Baumer had not met the criteria prescribed for intellectual disability under Listing 12.05. Those criteria included either a full scale IQ score of 70 or below or a full scale IQ score of 71–75 accompanied by a verbal or performance IQ score of 70 or below. As the ALJ aptly noted in this case, Baumer's full-scale IQ score of record was 87, with a verbal compression score of 102, both of which exceed listing criteria. These immutable facts further defeat Baumer's Step 3 argument.

At bottom, the plaintiff's attack on this Step 3 evaluation invites us to re-weigh the evidence. This we may not do. See Chandler, 667 F.3d at 359 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations"); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence. Finding that this deferential standard of review is met here, we conclude there was no error in the ALJ's Step 3 evaluation.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas,

Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case will affirm the decision of the Commissioner.

## IV. **Conclusion**

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: October 23, 2026